IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| RANDALL S. YOUNG and THESSA G. YOUNG, as next friends of ASHTON YOUNG | } } ) |
| | } |
| VS. | } |
| | } |
| MEMORIAL HERMANN HOSPITAL SYSTEM, d/b/a MEMORIAL HERMANN HOSPITAL, MEMORIAL HERMANN HEALTHCARE SYSTEM, STACY MACDONALD, R.N., ALI RIEDLE, R.N., RURAL/METRO OF TEXAS, L.P., RURAL/METRO OF TEXAS, G.P., INC., RURAL/METRO OF TEXAS. INC., OF TEXAS, INC., JOSE MEDINA, M.D. KATRIN Y. TAKENAKA, M.D. | } } } } } } } } } } } | CIVIL ACTION NO. H-03-1859

**MEMORANDUM OPINION ON MOTIONS FOR SUMMARY JUDGMENT**

Pending before the Court are a number of motions for summary judgment filed by the Defendants in this medical malpractice lawsuit, as well as a great number of additional motions. Memorial Hermann Hospital System, d/b/a Memorial Hermann Hospital, Memorial Hermann Healthcare System (" Memorial Hospital Entities"), Stacy MacDonald, R.N., and Ali Riedle, R.N. have filed one motion (Instrument No. 151) and Jose Medina, M.D., and Katrin Y. Takenaka, M.D. have filed another (Instrument No. 176). The Rural/Metro Entities: Rural/Metro of Texas, L.P., Rural/Metro of Texas, G..P., Inc., and Rural/Metro of Texas, Inc., have filed two motions, one contingent upon the other (Instruments No. 146 and 150). Instrument No.146 includes among other grounds, the grounds set forth in motions of the Memorial Hospital Entities, the medical doctors and the registered nurses.

FACTUAL BACKGROUND

There is very little disagreement about the factual background of this case. The Plaintiff, Randall S. Young, who on March 29, 2003 had driven from his home in Louisiana to Houston to attend a Super-Motorcross Event at Reliant Station, was found wandering aimlessly in the area of the upper level concession stands. He was 37 years old. Rural/Metro Event Emergency Medical Services were called at approximately 8:32 p.m., and care was provided by an EMT and a paramedic employed by Rural/Metro. Rural/Metro transported Young to Memorial Hermann Hospital, and he arrived at the emergency room at 9:15 p.m. Young was triaged by registered nurse Stacy MacDonald at 9:20. At 9:23 Nurse MacDonald sent Young to a treatment room where he immediately began receiving treatment by Jose Medina, M.D., a first-year resident physician employed by the University of Texas Medical Foundation who was working that night in the Memorial Hermann Hospital's Emergency Department and Katrin Takenaka, M.D., an attending emergency physician employed by the University of Texas Health Science Center, who was working that night in the Emergency Department at Memorial Hermann Hospital. Nursing care was provided to Young by registered nurse Alie Riedle. At 2:30 a.m. on March 30, 2003 Young was diagnosed with a stroke. He remained at Hermann Hospital for over a month and is severely and permanently disabled from the stroke.

PLAINTIFFS' CONTENTIONS

Plaintiffs contend that Randall Young's stroke should have been timely and appropriately assessed, diagnosed, and treated by the Defendants, and that had he been timely diagnosed he would have met the inclusion criteria for treatment with a tissue plasminogen activator

(tPA ),[1] which, more likely than not would have meant a better outcome and a less severe deficit to his ability to function normally.

DEFENDANTS' CONTENTIONS

Putting aside the many allegations of specific instances of negligence made against the various Defendants, this opinion focuses only upon the contention of the Defendants that as a matter of law there was a less than 51percent chance that Randall Young, had he met the inclusion criteria and been timely treated with tPA, would have benefitted from the treatment. Under Texas malpractice law, which rejects the "lost chance doctrine" as a cause of action, there is no liability for negligent medical treatment that deprives a patient of less than a 51percent chance of avoiding injury. *Cf. Kramer v. Lewisville Memorial Hospital*, 858 S.W. 2d 397, 400-403 (Tex. 1993). Chief Justice Phillips put the issue in this way in the *Kramer* opinion: "[W]hether there is liability for negligent treatment that decreases a patient's chance of avoiding death or other medical conditions in cases where the adverse result probably would have occurred anyway." 858 S.W. 2d 398.

SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides "The [summary] judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving parties have the burden of proving that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. The Court must view the evidence and the factual inferences from the evidence in the light most favorable to the nonmoving party and resolve all

---

[1] Marketed under the brand name Activase.

reasonable doubts about the facts in favor of the nonmoving party. *Boston Old Colony Ins. Co. v. Tiner Assoc., Inc*., 288 F.3d 222, 227 (5th Cir. 2002). A material fact is one that can affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A "genuine issue" is one that can be resolved only by a trier of fact because it may be resolved in favor of either party." *Anderson,* 477 U.S. 248-49. If a reasonable juror could resolve the disputed fact in favor of the nonmoving party, then that fact is "a genuine issue of material fact." *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 533 (5th Cir. 1996).

ANALYSIS

To recover on their claims against all the Defendants, the Plaintiffs must prove as to each Defendant four elements. **First**, Plaintiffs must prove that the Defendant had a duty to act according to applicable standards of care. **Second**, Plaintiffs must prove that the Defendant breached the applicable standard of care. **Third,** Plaintiffs must prove that Randall Young was injured. **Fourth**, Plaintiffs must prove that there was a causal connection between the breach of care and the injury. *Denton Regional Medical Center v. LaCroix*, 947 S.W. 2d 941, 950 (Tex. App.–Fort Worth 1997, *pet. denied*). For purposes of the motions for summary judgment the first three elements are conceded, and the focus is upon the fourth element, causation.

Ultimately, the standard of proof on the issue of causation is "whether, by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the [injury] and without which the harm would not have occurred." *Park Place Hosp. v. Estate of Milo*, 909 S.W. 2d 508, 511 (Tex. 1995) (quoting *Kramer,* 909 S.W. 2d at 511). Randall Young suffered an ischemic stroke, that is, a stroke caused by a blood clot. None of the Defendants is alleged to have contributed to the onset of that stroke. Rather, they are alleged to have

4

failed to recognize his symptoms as being that of a stroke early enough to have allowed his stroke to be treated with the drug tPA, which, simply put, breaks up the blood clot.  Plaintiffs paint a largely uncontroverted picture of missed opportunities on the part of the medical emergency personnel, the triage nurse, the emergency room doctors and nurses, and the readers of the CT scan to gain and process information about Young's condition that would have lead to the administering of tPA during the three hour time window from onset of his stroke.   The failure to timely diagnose the stroke resulted in the failure to administer the drug that Plaintiffs maintain deprived Young of the opportunity of lessening substantially the effects of the stroke.  This delay in diagnosis, Plaintiffs' argue, breached the standard of care and was a substantial factor in causing Young's injury, that is, his  physical disabilities, and without which he would not have suffered the physical disabilities.   Defendants argue that the delay in diagnosis of the stroke cannot be proved within reasonable medical certainty to be a cause of the physical disabilities Randall Young now suffers.

Plaintiffs' evidence of causation consists entirely of the expert opinions of their three medical experts:  Peter G. Bernad, M.D., a physician board certified in ten separate areas, including neurology, internal medicine, and electroencephalography; Paul M. Katz, M.D., Medical Director of the Washoe Comprehensive Stroke Center in Reno, Nevada; and Guy G. Gansert, M.D. a physician board certified in emergency medicine.  In order to "constitute evidence of causation, a medical expert's opinion must rest in reasonable medical probability."  *Tennyson v. Phillips*, No. 12-02-00154-CV, 2004 WL 63158 (Tex. App.–Tyler, Jan 14, 2004, *rev. denied*) )citing *Burroughs Wellcome Co. v. Crye*, 907 S.W. 2d 497, 500 (Tex. 1995)).  "Reasonable medical probability" is established, when it becomes "more likely than not" that the condition or injury complained of resulted from the event."  *Id*.  There is no dispute that  the effect of the reasonable medical

5

probability standard is to allow recovery when the evidence indicates that there is "more than a fifty percent chance," that the injury complained of resulted from the negligence. *Marvelli v. Alston*, 100 S.W.3d 460, 480 (Tex. App.–Fort Worth 2003, *rev. denied*)

Plaintiffs' experts contend that Young should have been given tPA because it would have improved his chances for a better neurologic outcome, but the statistics reported in reliable, peer reviewed medical literature and the deposition testimony of Plaintiffs' medical experts, demonstrate that tPA therapy offered less than a 51percent chance of avoiding the injuries caused by the stroke. At their depositions the experts agreed that the 1995 NINDS study[2] was an authoritative scientific study. It reported that tPA, when used correctly, provided an 11 to 13 percent increased chance of avoiding neurologic injury. The percentage increase in the chance of a good outcome with tPA therapy is known as the "absolute benefit," which is calculated in the NINDS study by subtracting the percentage of patients that had a good outcome, but did not receive tPA from the percentage of patients that had a good outcome and did receive tPA. *New England J. Med*. 333, 1581, Figure 2 at 1586 (1995),  This finding is also reflected in the package insert for Activase, the trade name for tPA, which interprets the data from the NINDS study to demonstrate an 11 per cent increased chance of good outcome with tPA. Exhibit K to Document No. 151.

Nevertheless, Plaintiffs' experts cited the NINDS study's "relative benefit" statistic, an approximate thirty-three per cent chance of having little or no neurologic deficit,  three months after a stroke.

---

[2] The National Institute of Neurological Disorder and Stroke rt-PA Study Group, Tissue plasminogen activator for acute ischemic stroke: *New Eng. J. Med*. (1995) 333 (attached as Exhibit I to Memorial Hermann, et al's Motion for Summary Judgment, Document No. 151).

Dr. Bernard testified in his deposition[3]

> Well again, my opinion, based on a reasonable medical certainty, is that had tPA been given he would have had a better chance in terms of outcome; that is at three months he would have had at least a 33 per cent better chance of outcome than had nothing been done. And the question you're asking is whether he would have been normal had they given tPA, but I have concluded, as I report in my note and my dictation, that had tPA been given he would have had a better chance of having a better neurologic sequelae than he has had now, than we know he has had.

Further, Dr. Bernad admitted that Young had suffered an occlusion of the proximal middle cerebral artery and was thus less likely to benefit from tPA than other patients. Exhibit L to Instrument No. 151 at 275.

Dr. Gansert testified at his deposition "the initial studies–and I can't quote it, okay, I don't have it in front of me–but from my understanding in having heard lectures and read this previously that approximately a third of the patients, if I recall, had improvement at six months."[4] He admitted that it would be speculative to state that Young would have avoided the effects of his stroke if given tPA therapy. Exhibit U to Instrument No. 151 at 188.

Dr. Katz testified in his deposition[5] that "we don't know" whether or not Randall Young would have responded appropriately to tPA therapy.

Thus, at their depositions, the Plaintiffs' doctors agreed that the chance of Young's symptoms of stroke improving with the timely administering of tPA was less than 51 percent.

---

[3] Exhibit L to Instrument No. 151 at 175-76.

[4] Exhibit U to Instrument No. 151 at 186.

[5] Exhibit V to Instrument No. 151 at 97-98

In response to the motions for summary judgment, Plaintiff obtained affidavits from these three doctors, which contradicted their deposition testimony on Young's chance of recovery with tPA treatment. Defendants subsequently moved to strike (Instrument No. 259) the doctors' "sham" affidavits because it is law in the Fifth Circuit Court of Appeals that "this court does not allow a party to defeat a motion for summary judgment by using an affidavit that impeaches, without explanation, sworn testimony." *S.W.S. Erectors, Inc. V. Infax, Inc., 72 F.3d 489, 495 (5th Cir. 1996); Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223,228 (5th Cir. 1984). All three experts were deposed in September 2005 and were asked to identify and provide all relevant medical literature on which their opinions were based, but none of the doctors identified or provided the article they cited in their affidavits. Dr. Bernad testified at his deposition that he had brought a binder of approximately 26 articles on tPA, which he compiled as an "ongoing work." Exhibit B to Defendants' Motion to Strike, Instrument No. 259 at pages 38-39, 40-42, 62-63, 65. Dr. Bernard further testified that he had brought to the deposition references to "the articles that were relevant for me at that time when I concluded my report." *Id*. at pages 65-66. Dr. Katz testified at his deposition that he brought "his entire file on this matter," and did not withhold any materials responsive to the *subpoena duces tecum.* Exhibit D to Instrument No. 259 at pages 35, 64. Dr. Gansert stated repeatedly at his deposition that he was not relying on any medical literature to form his opinion in the case. Exhibit F to Instrument No. 259 at 29-30. All three doctors were asked to provide all relevant literature, and all three said they had, but none provided or identified the article upon which their post-deposition affidavits were based. Their explanations in the affidavits that they did not testify about the article because they were asked no questions about it are disingenuous. These three affidavits could be stricken, as the Defendants move, or the Court could simply ignore

them as inappropriate because contradictory to sworn testimony. The Court will ignore these affidavits, but even if they are considered, they do not defeat Defendants' summary judgment.

The article found by the doctors after their depositions was said to identify a subgroup of the NINDS study, carved out by age and NIH stroke scale score. This article, published in 1997 in the journal *Stroke,* is entitled "Generalized Efficacy of t-PA for Acute Stroke: Subgoup Analysis of the NINDS t-PA Stroke Trial.[6] The page 1 Abstract of that article identifies its "Background and Purpose" as "to identify subgroups of stroke patients in whom thrombolytic therapy is particularly hazardous or efficacious." In the "Results" section, at page 5, the article states,

> Only age-by-NIHSSS interaction, diabetes, admission MAP-by-age interaction, and thrombus or hypodensity/mass effect on baseline CT scan were independently associated with favorable outcomes in this study. None of these terms, however, had a significant interaction with t-PA treatment (from step 5). That is, each of the variables and interactions in Table 2 significantly influenced outcome, but none of them influenced the likelihood of differential response to t-PA.

In layman's terms, the younger the patient, the more likely he will recover, but his youth does not have an impact on the efficacy of tPA treatment. "No interactions with treatment were detected, implying that the variables listed influenced outcome independently of treatment. Exhibit A to Instrument No. 209 at Table 2, at page 31.

Table 3 of the article, at page 31 of Exhibit A to Instrument No. 209, forms the basis for Dr. Bernad's affidavit statement, "Fifty-nine percent of the patients receiving tPA within this subgroup [patients less than or equal to sixty years of age with a baseline NIH stroke scale score of

---

[6]Exhibit A to "Defendants' Reply in Support of their Motion for Summary Judgment, Instrument No. 209.

zero to nine] had a favorable outcome." Exhibit 5 to Plaintiffs Response to Defendants' Motion for Summary Judgment, Instrument No. 195. Dr. Katz's new analysis is similar: "Assuming that Randy Young had an initial NIHSS of 7 as is indicated by Dr. Pancioli, Defendants' expert, the study indicates that 59 percent of all patients less than 60 years old given tPA have a favorable outcome. This is clearly greater than 50 percent". Exhibit 6 to Instrument No 195. Dr. Gansert's affidavit states, "I understand that subgroup analysis of the 1995 NINDS stroke study supports my opinion that Randy Young, more likely than not would have had a very favorable outcome had tPA therapy been administered to him. . . ." Exhibit 3 to Instrument No. 195. The 59 percent  statistic is flawed, however, because it does not identify the percent of patients benefitting from tPA treatment, but includes both patients benefitting from tPA treatment and patients spontaneously recovering, without benefit of treatment. Table 3 of the article reveals that there were 46 individuals in the study who were sixty years old or younger and had an NIHSS score of 0-9. Fifth-nine percent of those treated with tPA had a good outcome, while 42 percent of those treated with placebo had a good outcome. In order to find the increased percentage of good outcome attributable to tPA, the placebo group (42 percent) must be subtracted from the tPA group (59 percent),  for an increased chance of 17 percent.

Plaintiffs argue in their Response to the Defendants' Reply to the Motion for Summary Judgment (Instrument No. 223) at page 7  that there is no authority for the Defendants' use of "absolute benefit" percentages to replaces a proximate cause analysis. The absolute benefit informs the proximate cause analysis, however,  because ignoring the absolute benefit percentages ignores the accepted scientific methodology, a placebo control group, used to test a drug's efficacy. When it has been demonstrated,  in more than one scientific study, that an absolute benefit number can be established,  it is against all reason to ignore that number in favor of the vague and

unsupported "more likely than not" opinions based upon unspecified, untested, and unreviewed anecdotal evidence from the experience of the expert witnesses.  This, in essence, is what the Plaintiffs are asking the Court to do.  No matter how many times Plaintiffs argue that they have not brought "lost chance" case, the undisputed facts are that they have.  They have not and cannot show, as a matter of law,  that Randall Young had a 51 percent or greater chance of avoiding his severely disabled condition had he received tPA treatment at Hermann Hospital on March 29, 2003.  It is for that reason that the Court GRANTS the Defendants' Motions for Summary Judgment.

       Signed at Houston, Texas, this 14th day of July, 2006.

                                    MELINDA HARMON
                                UNITED STATES DISTRICT JUDGE